## STRICKLIN,
*Respondent,*

*v.*

## STRICKLIN et al,
*Appellants.*

(CC85-2003; CA A47875)

776 P2d 18

Peter R. Chamberlain, Portland, argued the cause for appellants. With him on the briefs was Bodyfelt, Mount, Stroup & Chamberlain, Portland.

Jacob Tanzer, Portland, argued the cause for respondent. With him on the brief was Ball, Janik & Novack, Portland.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendants William, John and Sarai Stricklin appeal from a judgment of rescission in favor of plaintiff.[1] They assign as error the holding of the trial court that plaintiff is entitled to rescission of a deed from her to her sons William and Robert Stricklin because of undue influence and the denial of their cross-claim against Robert for partition. We review *de novo,* and reverse and remand.

Plaintiff owned a farm that she wished to convey to William and Robert as part of her estate planning. She intended that the property remain in the family but believed that a "management" agreement, which the parties refer to as "a co-tenancy agreement," between Robert and William was necessary, because they did not agree on how the land should be used. Although they discussed the subject of transferring the farm for several years, no documents were drafted until 1981.

In March, 1981, William, an attorney, sent plaintiff, plaintiff's attorney, plaintiff's accountant and Robert documents proposing to effect a transfer of the property to William and Robert. The documents included a deed to them as tenants in common, a purchase money mortgage with 13 promissory notes and a rental agreement. Plaintiff did not sign the documents. In September, 1981, William sent a duplicate set of the documents to plaintiff for her signature. Again, she declined to sign them.

In November, 1981, William sent essentially identical sets of the documents to plaintiff and to Robert, informing Robert that he would come to the farm at Christmas time and hoped to conclude the negotiations at that time. As an alternative to cotenancy, William proposed a division that would allow each son to do what he wanted with his half. Robert did not come to the farm for Christmas, but William did. On the

---

[1] Defendants William and Robert Stricklin are plaintiff's sons. Defendants John, Sarai, Martha and William Albert IV are William's children. Robert and Martha are not parties to this appeal. John is not a party to the appeal in his capacity as "Trustee of the Stricklin Family Trust," although he was named a defendant in that capacity. Before trial, the parties stipulated that William Albert IV be deleted from the caption because of his death. Subsequently, the judgment dismissed the action as to him and as to defendants "William A. Stricklin, Attorney, a Law Corporation, a Hawaii Professional Corporation," and "William A. Stricklin, a Hawaii Real Estate Corporation."

morning of December 22, 1981, William presented the documents to plaintiff. Plaintiff testified that William knew of her desire for a cotenancy agreement but admitted that none had been drafted in the preceding months. She could not recall any specific representations made by William before she signed the deed that he would enter into a cotenancy agreement. William testified that he never suggested a cotenancy agreement or drafted a proposal before December 22, 1981. Plaintiff testified that moments *after* she signed the deed, she inquired, "Now what about the agreement?" and that William replied, "We can take care of that later." William left to record the documents.

After December 22, 1981, and for the next year and a half, plaintiff attempted to persuade William to enter into a cotenancy agreement with Robert. William never expressly refused. Plaintiff expected William to draft an agreement, but he never did. In March, 1982, plaintiff sent a proposed draft of a management agreement to William. He declined to sign it. Correspondence ensued between William and Robert in which William expressed disapproval of proposed drafts or suggested changes. At some point, William said that he would provide a draft. In December, 1982, Robert wrote to William making suggestions as to provisions in the agreement. Thereafter, William distributed a form of cotenancy agreement that provided no express manner of resolving disputes. It was unsatisfactory to plaintiff and to Robert.

In March, 1983, plaintiff had her attorney prepare another agreement, containing what she felt were the bare essentials, and sent it to William. William responded that he believed that he and Robert could work out an agreement but that he was still concerned about tax consequences. He informed plaintiff's attorney that an agreement would be "forthcoming."

Because William did not follow through, plaintiff sent mailgrams to Robert and William on September 4, 1983, requesting that the property be deeded back to her. William refused, and plaintiff then engaged counsel. In December, 1983, plaintiff's attorney undertook to negotiate with William. Although the parties continued to correspond, negotiations were unsuccessful, and plaintiff filed her complaint in January, 1985.

Plaintiff argues that a confidential relationship existed between plaintiff and William and that the conveyance documents were the result of William's undue influence on plaintiff. In *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886 (1958), the court rejected a definition of "undue influence" as the deprivation of the exercise of the grantor's free will and instead held that the definition poses the question as whether "the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper." 214 Or at 419.

In her complaint, plaintiff alleges that William represented to her that, if she would convey the farm to William and Robert as cotenants, William would execute a management agreement with Robert, and that William also represented to her that it was necessary that plaintiff convey the property before the end of 1981 for tax and estate planning purposes, instead of waiting for the preparation and execution of the agreement. We understand those allegations to be the "conduct" by which plaintiff alleges William "gained an unfair advantage."[2]

**1, 2.** Ordinarily, the grantor would have the burden of establishing the existence of undue influence. However, the Supreme Court has adopted a rule that

"the existence of a confidential relationship * * * when taken in connection with other suspicious circumstances may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference." *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572 (1946).

Here, plaintiff and William had a confidential relationship. Plaintiff relied on her lawyer son for advice and was justified in placing confidence in the belief that he would act in her interests. *See Osterberg v. Osterberg,* 278 Or 277, 282, 563 P2d 696 (1977). Additionally, there are circumstances in this case

---

[2] The amended complaint on which the case was tried contains "common allegations" for claims of "intentional misrepresentation," "undue influence" and "failure of condition subsequent." Plaintiff withdrew her claim of "failure of condition subsequent." The alleged misrepresentations are contained in the "common allegations." Other than incorporating those common allegations, the "undue influence" claim merely alleges that "[p]laintiff conveyed the Stricklin farm as a result of undue influence exercised by William upon her."

which "justify a suspicion of undue influence." For example, William prepared the documents and procured plaintiff's signature without Robert's knowledge or presence. *See In re Reddaway's Estate, supra,* 214 Or at 421-22.[3]

**3.**     The issue, then, is whether defendants' evidence is sufficient to overcome the inference of undue influence that arises from the circumstances of the transaction and plaintiff's relationship with William. In her testimony, plaintiff did not claim that, in December, 1981, and before the execution of the deed, William *represented* that he would sign a cotenancy agreement if plaintiff would convey the farm.[4] William testified that the first discussion about a cotenancy agreement occurred just after the signing of the deed. Plaintiff's attorney testified that he did not hear about a cotenancy agreement until after the deed was recorded. Plaintiff's accountant testified that, before the execution of the deed, plaintiff had never mentioned a cotenancy agreement as a condition to her deeding the property. Although the need for an agreement may have been discussed previously, and although plaintiff may have had an expectation that William would sign such an agreement, there is no evidence that he agreed to do so until after the deed was signed.

**4.**     Both plaintiff and William are strong willed, well educated, articulate individuals. The evidence is clear that plaintiff hoped that a cotenancy agreement would be entered

---

[3] Suspicious circumstances that will give rise to an inference of undue influence in a confidential relationship are: (1) procurement by the grantee; (2) lack of independent advice; (3) secrecy or haste; (4) change in the grantor's attitude toward others; (5) change in the grantor's plan of disposing of property; (6) unnatural or unjust gift; and (7) grantor's susceptibility to influence. *In re Reddaway's Estate, supra,* 214 Or at 421-22.

[4] Plaintiff testified:

"Q And there had been no discussion during that whole Christmas vacation, up to the time of signing the deed, about a co-tenancy agreement, had there?

"A I don't know. The whole Christmas vacation, the whole Christmas holiday season was a long enough time that I can't be specific about what we talked about. Bill and I have a good communication, we used to have a good communication where we didn't have to sit down and look eyeball to eyeball, there was a lot of offhand remarks, and we understood each other. So the—to sit down and have a formal discussion about an agreement, it wouldn't have had to have been necessary. Bill knew I wanted an agreement."

We note that the trial court stated in its "findings of fact" that "the evidence does not establish that William committed fraud."

into by William and Robert. However, the test for undue influence emphasizes "the nature of the influencer's conduct" in persuading the grantor to act. *In re Reddaway's Estate, supra,* 214 Or at 419. Here, William did nothing to gain *an unfair* advantage by devices which reasonable men regard as improper. He simply pursued the execution of the document without mention of a proposal to which he was not agreeable. Any promise that may have been made to enter into the agreement occurred after the execution of the deed and was not an inducement to plaintiff to sign the deed. We conclude that defendants have overcome the inference that the deed was signed because of undue influence and that plaintiff is not entitled to rescission.[5]

Judgment of rescission reversed insofar as it affects the interests of William Stricklin; remanded for consideration of the cross-claim for partition.

---

[5] The assignment of error about William's request for restitution is moot as a result of our holding. Our holding revives William's cross-claim for petition of the property, and we remand so the trial court may consider it. Because Robert did not appeal the judgment of recission it remains effective as to him.